Donald Lamont, Plaintiff in Error, v. S. R. Moss Cigar Company and F. L. Koehn, Defendants in Error.

Gen. No. 24,936.

1. CORPORATIONS, § 754*—*when foreign corporation is not immune from process.* That a foreign corporation is engaged in interstate commerce and, therefore, does not need a license from the State to do business therein does not give it immunity from the service of process issued by a court of the State.

2. CORPORATIONS, § 709*—*when foreign corporation is doing business in State.* In an action against a foreign corporation which pleads to the jurisdiction, asserting that it never did business in the State and that the person served as its alleged agent was not a representative capable of being served, uncontradicted evidence that the corporation's product was being exploited in the State and large sales of its product were being made there; that the efforts in this regard were being made by the agent served, whom it paid a salary and commissions; that the corporation paid the agent's stenographer and home-office expenses, in part at least; that it furnished him stationery expressly announcing that he was its representative; that, in several instances, the agent collected

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

delinquent accounts for it; that he made allowances to jobbers for advertising to advertise the corporation's product purchased through him; that another person employed by it in the State was under such agent's direction and was engaged in "missionary work" for the sale of such product; that the goods sold to retailers in the State by these means would be sent to the jobber in the State and the "missionary" would also get paid for his services, it was *held* that the corporation was doing business in the State and that service upon such agent was sufficient to confer jurisdiction.

3.   CONSPIRACY, § 14*—*when evidence is insufficient to show conspiracy*. In an action to recover for damages alleged to have been sustained through the conspiracy of defendants to deprive plaintiff of the benefits of a certain contract, to deprive him of commissions and of his good name, reputation and credit in the trade and to prevent him from securing orders, through causing him to be discharged and through circulating false and defamatory reports and stating that he was of unsound mind, evidence examined and *held* insufficient to establish a prima facie case, and that a verdict was properly directed for defendants.

Error to the Superior Court of Cook county; the Hon. MARCUS A. KAVANAGH and the Hon. OSCAR HEBEL, Judges, presiding.   Heard in the Branch Appellate Court at the March term, 1919.   Affirmed in part, reversed in part and remanded.   Opinion filed July 7, 1920.

FRANCIS E. HINCKLEY and BANGS, FRANKHOUSER & COLBY, for plaintiff in error.

RINGER & WILHARTZ, for defendant in error S. R. Moss Cigar Co.; ORVILLE R. SEITER, of counsel.

MR. PRESIDING JUSTICE TAYLOR delivered the opinion of the court.

The plaintiff brought suit against the defendants, S. R. Moss Cigar Company and F. L. Koehn, claiming that they conspired to deprive him of the benefit of a certain contract; to deprive him of certain commissions; to deprive him of his good name, credit and

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

reputation in the cigar trade; to prevent him from securing additional customers or orders for any other cigar concern; that they caused him to be discharged; and circulated in the cigar trade and generally, untrue, malicious and defamatory reports intending to disgrace him and maliciously intending to prevent him from securing any other employment in the cigar business or his selling cigars to any of those with whom he had formerly dealt; that they circulated among cigar dealers with whom he had dealt, a report that he was of unsound mind and was no longer responsible nor fit to do business. The foregoing was recited in the so-called tenth count of the declaration. Subsequently, an amended count was filed, reciting, substantially, the contents of the tenth count, and adding a recitation of certain specific acts.

Koehn pleaded the general issue, and S. R. Moss Cigar Company pleaded that it was a Pennsylvania corporation; that it never did business in the State of Illinois; that it had no officer or agent in this State, and that William H. Orr, upon whom, as its alleged agent, service was had, was not such a representative as was capable of being served; and that, as a result, the court did not obtain jurisdiction. There was a replication to the plea to the jurisdiction. There was a trial by jury as to the special plea, and a *verdict* for the S. R. Moss Cigar Company, upon an instruction, from the trial judge, to find for that defendant.

We are of the opinion that the plea of the defendant, S. R. Moss Cigar Company, to the jurisdiction was not sustained. The evidence of Orr, who was employed by that company as salesman for the City of Chicago, conclusively shows that the S. R. Moss Cigar Company did business in Chicago in the year 1915. With that company Orr had a written contract. He had a drawing account of $250 per month, and, in addition, traveling expenses, both paid by it. The S.

R. Moss Cigar Company was a cigar manufacturing company, located at Lancaster, Pennsylvania. Orr sold cigars for it, both to wholesalers and retailers in Chicago; to such firms as E. Hoffman & Company, Nathan Fox, and Many, Blanc & Company. He called on druggists and retail cigar dealers to advertise the company's cigars. He made allowances to jobbers for advertising matter in order to advertise the cigar purchased through him from the company; and the retailers purchased from the jobbers. He employed one McFarland to do "missionary work" for him on behalf of the company and the company paid McFarland's salary. Orr got 5 per cent on all goods shipped into Chicago. Further, it is obvious from the correspondence between Orr and the company that they were doing considerable business in Chicago, selling hundreds of thousands of cigars. The company, also, furnished Orr with stationery which expressly stated that he represented "S. R. Moss Cigar Co., Lancaster, Pa." It was sent from Lancaster, Pennsylvania. Orr employed his wife as a stenographer and paid her for her work and conducted an office at his home in Chicago; and that expense was charged to the company. In several instances Orr collected delinquent accounts. Moss told Orr he wanted him to use his home as an office. The evidence of McFarland is that he was employed by the company and they paid him for his services rendered in Chicago, and that those services consisted e. g. in going with a salesman of Nathan Fox Company and calling on the retail trade and introducing a cigar of the S. R. Moss Cigar Company; that the goods were then sold and delivered by Nathan Fox Company and paid for by its customers. McFarland would then send duplicates of the orders to the S. R. Moss Cigar Company and that company would pay him.

We think the evidence in the instant case, that the S. R. Moss Cigar Company was doing business in this

State is far stronger and more persuasive than that in *Italian-Swiss Agricultural Colony v. Pease,* 194 Ill. 98. In that case the court sanctioned as the law the following: "If a corporation knowingly and voluntarily permits a person to hold himself out to the world as its agent, said corporation will be bound as principal to those dealing with such person to (who) act upon the faith that such agency exists; and this is true irrespective of whether or not an agency in fact exists." And, further, the court said: "The appointment may be established by implication of law arising out of the conduct of the parties, or by way of estoppel."

In *Booz v. Texas & Pac. Ry. Co.,* 250 Ill. 376, where the person served merely solicited shipments of freight by way of the defendant railroad, and solicited prospective passengers to purchase tickets over that line, all of which railroad was outside of this State, the court held that the defendant was not doing business in this State and that the writ should be quashed. The court there said that "The decisions of the courts are that mere solicitors of business are not agents, within the meaning of the statute." It must be borne in mind that the solicitor referred to, in that case, only solicited freight and passenger carriage on the defendant railroad located outside of this State. *Black-Clawson Co. v. Carlyle Paper Co.,* 133 Ill. App. 61, pertains only to a case where the question arises on section 67b, chap. 32, Hurd's Rev. St. 1905 (J. & A. ¶ 2526), that is, the necessity for a certificate from the Secretary of State. The same is true of *Union Cloak & Suit Co. v. Carpenter,* 102 Ill. App. 339, and the *Journal Printing Co. v. Inter-Ocean Newspaper Co.,* 167 Ill. App. 274. A number of similar decisions are analyzed and commented upon in *Journal Co. of Troy v. F. A. L. Motor Co.,* 181 Ill. App. 530.

Making a corporation amenable to process, because it is doing business in this State, does not in any way

affect or restrict rights which grew out of the fact that the business it is doing may be Interstate Commerce. The law that exempts interstate commerce corporations from the need of a State license does not exempt them from service of process issued by a State court; they have no such immunity.

The defendant Moss Company offered no evidence to show it was not doing business in this State, so that the plaintiff's evidence stands uncontradicted, and there was no evidence to show that it did no other business in this State. The burden was on the defendant to support its plea.

Considering what the S. R. Moss Cigar Company was doing in the State of Illinois; the exploitation of its cigars; the large sales that were being made; the efforts in its behalf made by Orr, to whom it had given written authority; to whom it paid a salary and commissions; whose stenographer and home-office expenses, in part at least, it had paid for; to whom it furnished stationery which announced in express words that he was its representative; that in several instances he collected delinquent accounts; that he made allowances to jobbers for advertising matter in order to advertise the cigars purchased through him from the company; also, one McFarland was employed by it in Chicago and was under Orr's direction; that he went around doing what is called "missionary work"; that as a result cigars—in large quantities—were sold to different retailers in Chicago; that those cigars would then be sent to the jobber in Chicago by the S. R. Moss Cigar Company and, in addition, McFarland would get paid for his services, we are of the opinion that the S. R. Moss Cigar Company was doing business in Chicago and that the service on Orr as its agent was sufficient to give the court jurisdiction.

Subsequent to the trial of the plea to the jurisdiction and the finding thereon in favor of S. R. Moss

Cigar Company, there was a trial on the merits between the plaintiff and the defendant Koehn. The evidence introduced by the plaintiff was substantially the following: The plaintiff, who had been for many years in the cigar business, was on March 2, 1912, employed by S. R. Moss Cigar Company (hereafter called the Moss Company) as traveling salesman in a certain defined territory which included Chicago. By his contract of employment he was to offer and sell the cigars of the Moss Company exclusively and receive 5 per cent commission, and 5 per cent on duplicate orders, and he was to be paid $250 per month and necessary traveling expenses and to devote his time to the disposition of the output of the Moss Company. The contract further provided that "the extension of credit and the conduct of the business" rested solely in the Moss Company. About May 1, 1912, he met Koehn, the secretary of the wholesale liquor firm of Many, Blanc & Company. He told Koehn, in the presence of Many and Moss that 500 retail druggists had agreed to make a simultaneous window display of the Moss Company cigars and that every druggist had agreed to buy outright 200, and to buy as many more within the next 30 days; that the Moss Company needed a distributor for the cigars in Chicago as it did not sell direct to the retail trade but almost entirely to the jobbers. In consequence, Many, Blanc & Company of Chicago then bought $11,000 of that brand of cigar and Koehn agreed that the Moss Company salesman would see that the 500 druggists would get their orders and the Moss Company would send out advertising matter to each druggist and act as distributors in Chicago of the Moss Company. Prior to that time Many, Blanc & Company had no cigar department. From May, 1912 to November, 1913, Koehn managed the cigar department of Many, Blanc & Company and upon the latter date the plaintiff was given its management

and Many, Blanc & Company arranged that the plaintiff might draw—from Many, Blanc & Company—from 40 per cent to 50 per cent of the profits of his individual sales to the retail trade. That arrangement was made in the presence of Koehn, Many and Moss. Subsequently the plaintiff and Koehn had some dispute concerning the discharge of a woman who worked in the cigar room, the plaintiff claiming that her place ought to be filled by a man. On February 26, 1914, the plaintiff entered into a written agreement with Many, Blanc & Company. By that contract the plaintiff and, seemingly, the Moss Company, agreed to conduct the "selling end" and the management of the cigar department and it was provided that the plaintiff should pay the expenses of all salesmen connected with the cigar department of Many, Blanc & Company; that that company should advance, weekly, sufficient moneys for that purpose provided it did not exceed 50 per cent of the gross profits of all cigar orders taken during that particular week; that the salesmen of Many, Blanc & Company were not to solicit orders from the trade without the direction of the plaintiff. It was recited in that contract that not only Many, Blanc & Company agreed, but the plaintiff "for not only himself but for the S. R. Moss Cigar Company as well." After that contract was entered into a display was made in the stores belonging to the members of the association. That was in May, 1914.

On July 20, 1914, S. R. Moss came to Chicago and had a conference with Koehn in the office of Many, Blanc & Company and at that time the plaintiff had some talk with Moss in regard to a complaint which had been made by Koehn which was that the plaintiff was drawing 40 per cent of the profits on the cigar sales of their salesmen. The plaintiff talked with Moss at that time and told him that he would pay back a certain 20 per cent of the profits of certain

sales. On the next day there was a conference between Moss, Koehn and some of the employees concerning sales to the retail trade made by the plaintiff.

On July 31, 1914, the Moss Company wrote the plaintiff making some complaint and offering him 5 per cent commission on all goods shipped to Chicago which would be in addition to the 40 per cent of the profits of all the cigars sold to Many, Blanc & Company and 20 per cent of the profits of the cigars sold by that company's salesmen. The new offer suggested advancing him, on account, $60 per week and also offered to pay $25 per month for office rent. The change in their relations went into effect August 15, 1914. In a letter of September 19, 1914, signed by Many, Blanc & Company and Fred L. Koehn, secretary, it was stated that the Moss Company's representative "takes rather arbitrary actions, and is acting very ungentlemanly in our office. The next time he comes in here we will show him the door. * * * We cannot have your representative run our business."

On August 28, 1914, the plaintiff presented a statement to the cashier of Many, Blanc & Company for the 40 per cent that he claimed was due to him. There was some discussion as to whether he was entitled to 20 per cent or 40 per cent. The cashier said that Koehn told him that the Moss Company had told him a few weeks before not to pay the plaintiff but 20 per cent. There was some further talk and Many of Many, Blanc & Company told the plaintiff that he was entitled to 40 per cent.

On September 24, 1914, Moss of the Moss Company came to Chicago. He was met by the plaintiff and they went to the office of Many, Blanc & Company and they met one Richter who had charge of the cigar department and Koehn spoke to Moss but not to the plaintiff. The plaintiff said to them all, that he had written out a paper practically relinquishing his rights under his contract as there had been so

much condemnation of the manner in which the cigar department of Many, Blanc & Company had been conducted. That paper he handed to Koehn and also a copy to Moss. Following that, there was a wordy altercation between him and Koehn. The plaintiff then left the room and when standing by the cashier's desk overheard Koehn say to Moss that he, the plaintiff, was of unsound mind; that he had been selling scarcely a cigar and had been putting in his time on Christian Science; that Moss in answer to that said that the plaintiff was not to his knowledge of unsound mind; that he, the plaintiff, heard Koehn say that the plaintiff had quit smoking and would not allow it in his house; that he heard fragments of sentences; that he heard Moss say that if that was so he would discharge him but that he wanted to see Many first.

The plaintiff saw Moss during the next four days in St. Paul and some other northern cities. They traveled together and sold a large number of cigars. He did not see him afterwards until May 20, 1915, at the trial.

On November 24, 1914, the Moss Company wrote the plaintiff a letter in which, referring to his peculiar actions, which they said had been detrimental and injurious to them, they were compelled in their own interests to dispense with his services.

On cross-examination the plaintiff testified that it was part of his duty to collect money from Many, Blanc & Company due the Moss Company; that he had letters from the Moss Company asking him to collect money from Many, Blanc & Company; that Many said that Koehn was crazy; that his employment with the Moss Company terminated on November 4, 1914. He subsequently brought suit against the Moss Company for a breach of contract and recovered and collected a judgment of $1,745.

The evidence of one Richter, who was in the cigar

department of Many, Blanc & Company in the year 1914, is to the effect that he saw a published article in a trade paper called the Tobacco Leaf; that he asked Mr. Moss if the article was true and Moss said no; that he would be continued with Many, Blanc & Company as it always had been; that Moss further said that is some of Lamont's work and shows that he is of unsound mind. He further testified that Moss asked him if he had ever seen Lamont take intoxicating liquors or drugs; that Louis Burk, who was present and lived with the plaintiff said that he never saw him do anything wrong; that in the afternoon of that day Mr. Moss said that he had discharged the plaintiff and advised him, Richter, to keep away from the plaintiff "because he is pretty foxy and he is a little bit too clever for you"; that Koehn was present when that was said; that he remained in the employment of Many, Blanc & Company until the trial took place between the plaintiff and the Moss Company; that after he had testified in that case and had left the witness stand and was in the corridor outside of the court room, Koehn asked him some questions about being there and then discharged him. The witness also testified that on one occasion in October, 1914, when a letter was received, the superscription of which was in the plaintiff's handwriting, Koehn handed it to him and told him that he didn't want him to be getting mail from the plaintiff or have anything more to do with him; that if he did he intimated that he would be discharged.

The evidence of the witness Nowack, who was a bookkeeper for Many, Blanc & Company, from March, 1914 to September, 1915, is to the effect that he was present at several conversations between Koehn and Moss and the plaintiff; that in the latter part of November, 1914, an article in the Tobacco Leaf was discussed in the presence of the plaintiff, Moss and his son, Richter, Koehn and Burke; that when Richter

asked Moss if the article in the paper were true Moss said "no, that shows that Mr. Lamont is of unsound mind."

The witness Lindemeyer, who worked for Many, Blanc & Company, corroborates the testimony of the plaintiff in regard to changing the woman employee to that of a man; and that the plaintiff and Koehn had a dispute in the course of which the plaintiff said, "you are a moral and physical coward." The witness further corroborated Richter as to his being discharged by Koehn.

The evidence of the witness Clough, who in October, 1914, was a salesman for the Moss Company, and lived in Minneapolis, is to the effect that he had a conversation with S. R. Moss in the presence of two men, Conrad and Whitaker, in the course of which Moss told him that the plaintiff was crazy and was spending a great deal of his time studying Christian Science, figuring on becoming a practitioner.

The witness Briody, who was a representative of the Moss Company, is to the effect that Moss in November, 1914, in the City of Indianapolis, told him in answer to a question of one Dean, who had charge of a cigar department, that the plaintiff was crazy and that he was devoting his time to Christian Science and was going to become a practitioner.

The witness Pioso, who was employed by the Moss Company for 13 years as bookkeeper, is to the effect that in the office of the company in December, 1914, in the presence of several others, Moss stated that the plaintiff was studying Christian Science; that he must be of unsound mind; that he had given up a good position to be a scientist and that he was not attending to his duties in Chicago; that Moss further said that when he came back from Chicago that they were going to discharge plaintiff on account of his not attending to his duties; that his business was fall-

ing down; that a man studying Christian Science could not attend to his duties.

One Burie, a former stenographer of the Moss Company, testified to the effect that Moss said he would have to sever connections with the plaintiff on account of his not giving his attention to the business; that he was studying Christian Science.

The evidence of the witness Charles is to the effect that in the early part of the summer of 1914, in a conversation with Moss at Utica, Moss said: "Lamont is irresponsible, he has gone crazy, we have taken our accounts out of his hands, he is crazy on the subject of Christian Science and is going to take it up as a practitioner, and is going to quit the cigar business. He, in fact, almost came to blows with one of our best customers in the City of Chicago."

The evidence of the witness Koehn, the defendant, is that he owns 188 shares of the 524 shares of stock outstanding of Many, Blanc & Company; that the stock is worth $305 a share.

At the close of the plaintiff's evidence, and upon a motion by the defendant Koehn, the trial judge directed the jury to find for the defendant. A verdict was, accordingly, rendered and judgment entered thereon. To reverse that judgment, the plaintiff prosecutes this writ of error.

The contention of the plaintiff is that the evidence sufficiently tends to show that the defendant Koehn has committed a wrong, a *tort* of some kind, by which he has been damaged, and that the trial judge erred in directing a verdict for the defendant Koehn.

The story told by the evidence, an elaborate resumé of which we have set forth, is merely a recitation of a certain portion of the business life of the plaintiff as it was affected, chiefly, by the conduct of Koehn and Moss. Therein are recited facts going to show that he and Koehn, as to certain business matters, did not agree and did not get along amicably together.

There may be in it, also, a suggestion, here and there, that Koehn and Moss came to agree that the plaintiff was not the man for the work he was engaged in. But, as far as Koehn is concerned, there is no substantial evidence either of conspiracy or wrong. Though it shows Moss told a number of different people that the plaintiff was "crazy" or "of unsound mind" and that he had adopted "Christian Science," the only evidence against Koehn is the testimony of the plaintiff himself, that on one occasion, at the office of Many, Blanc & Company, he overheard Koehn say to Moss that he, Koehn, was of unsound mind. Of course that, alone, or even in conjunction with the other evidence, does not make out a prima facie case, such as that set forth in the declaration. Then, too, it must be observed, that it does not appear that when Koehn thus spoke to Moss it was not privileged as being part of a communication between two persons both interested in the habits of one who may be considered as an employee of each. As to the charge of alleged conspiracy to injure the plaintiff by defamation or otherwise, the evidence is obviously insufficient.

After a careful analysis of all the evidence bearing upon the cause of action as set up against the defendant Koehn, we are of the opinion that the plaintiff failed to make out a prima facie case and that the trial judge was entirely justified in directing a verdict in his favor.

The judgment is, therefore, affirmed as to Koehn; and as to the defendant, S. R. Moss Cigar Company, it is reversed and remanded.

*Affirmed in part, reversed in part and remanded.*

MR. JUSTICES O'CONNOR and THOMSON concur.